**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 24, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JC CHRISTOPHER PULHAM,

Defendant - Appellant.

No. 16-8019
(D.C. No. 1:15-CR-00136-NDF-1)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **BALDOCK**, and **HOLMES,** Circuit Judges.

Defendant-Appellant JC Christopher Pulham pleaded guilty to one count of

possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and

(b)(2), and was sentenced to ninety-seven months' imprisonment. He now appeals

from the district court's sentencing order on two grounds, both related to the

court's application of a five-level enhancement under § 2G2.2(b)(5) of the United

States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") for "a pattern of

activity involving the sexual abuse or exploitation of a minor." First, Mr. Pulham

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

argues that the district court committed plain legal error in applying the enhancement because the facts upon which the district court relied do not satisfy the Guidelines definition of "sexual abuse or exploitation."  Second, Mr. Pulham argues that the district court committed clear error in finding that he qualified for § 2G2.2(b)(5)'s enhancement because the court relied on hearsay-laden facts that did not bear the requisite indicia of reliability.  Exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we **affirm** the court's sentencing order.

**I**

**A**

On June 16, 2015, law enforcement agents assigned to the Wyoming Internet Crimes Against Children Task Force ("ICAC") executed a search warrant at Mr. Pulham's residence where they seized a desktop computer containing images of child pornography.  Mr. Pulham admitted to owning the computer and using it to search for and download child pornography.

On July 22, 2015, Mr. Pulham was charged by indictment with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (Count One), and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) (Count Two).  On December 11, 2015, as part of a plea agreement, the government dropped Count Two (i.e., receipt), and Mr. Pulham pleaded guilty to Count One (i.e., possession).

**B**

A United States probation officer completed a Presentence Report ("PSR") that specified a Guidelines base offense level of eighteen for Mr. Pulham's violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).[1] The PSR arrived at a final adjusted offense level of thirty-five based on a number of enhancements, including a five-level enhancement for "a pattern of activity involving the sexual abuse or exploitation of a minor" (that is, the "pattern-of-activity" enhancement), pursuant to § 2G2.2(b)(5) of the Guidelines.

The PSR recommended this enhancement based on a finding that Mr. Pulham had "at least three hands-on victims in Utah." Aplt.'s App., Vol. II, at 20. More specifically, the PSR recounted allegations made in the late 1980s by two young girls claiming that Mr. Pulham had sexually abused them and another young girl. Specifically, Mr. Pulham's half-sister, C.P., had accused him of forcing her and her younger sister, S.J., to engage in sexual intercourse with him. However, a medical examination of both girls shortly after the accusation revealed that neither of them had ever had intercourse. The doctor who conducted the examination nevertheless concluded that C.P. had been "fondled repeatedly." *Id.* The third alleged victim, J.H., a family friend, accused Mr. Pulham of forcing her to strip and then

---

[1] The probation officer used the 2015 edition of the Guidelines in preparing the PSR. Mr. Pulham does not object to this decision on appeal and, therefore, we also rely on this edition in resolving the issues in this case.

3

"grabb[ing] her between the legs and fondl[ing] her breasts." *Id.* at 21.

The conduct described in the PSR was obtained from records contemporaneously detailing the allegations that were filed with the Utah Department of Human Services ("DHS") and Utah Child Protective Services ("CPS"). The PSR specifically stated the following regarding the predicate conduct supporting the pattern-of-activity enhancement:

> Records from the [DHS] indicate that his sister, 13-year-old [C.P.], told her mother the defendant "raped" her and her six-year-old sister, [S.J.]. Interviews were conducted with both [C.P.] and [S.J.]. [C.P.] said she remembered being victimized as early as age 6, but primarily between the ages of 8–10 years old. She said he had full sexual intercourse with her, but a medical interview with a doctor revealed she was not a victim of sexual intercourse, but was fondled repeatedly. She also described an event when the defendant and a friend . . . were locked in the defendant's bedroom with [S.J.]. [C.P.] tried to get the door open, but had to summon her father's assistance. When she was able to ask [S.J.] what happened, [S.J.] said they made her take her clothes off.
>
> Another victim was [J.H.]. The [H] family and the defendant's family attended LDS church together, and the families lived near each other. [J.H.'s] mother advised [CPS] that [J.H.] was visiting the Pulham home, when JC [Pulham] asked her to remove her clothing. He was 15 and she was age 10. He grabbed her between the legs and fondled her breasts. She ran home, and her mother did not let her go to the Pulham residence any more. This event was reported on March 3, 1988.

*Id.* at 20–21. Later in the PSR, the probation officer stated that he had spoken with C.P. "who verified that she, her sister [S.J.], and a friend, [J.H.], had been victimized sexually by the defendant." *Id.* at 23.

4

Mr. Pulham, through his counsel, sent a letter to the probation officer objecting to the five-level pattern-of-activity enhancement, arguing that the allegations were not sufficiently reliable to support the enhancement. Mr. Pulham also noted that he had consistently denied the allegations and that they did not result in a formal prosecution or delinquency petition. The probation officer declined to remove the recommended pattern-of-activity enhancement from the PSR, citing Mr. Pulham's placement in a behavioral treatment facility following the allegations and also C.P.'s confirmation of the allegations.

## C

The district court held a sentencing hearing on February 18, 2016. The bulk of the hearing was devoted to Mr. Pulham's objection to the pattern-of-activity enhancement. Mr. Pulham's stepfather, Terry Pulham,[2] and his younger half-sister, S.J., testified on behalf of Mr. Pulham in an attempt to refute the allegations of sexual abuse in the PSR. Terry Pulham testified that he had never witnessed Mr. Pulham engage in any inappropriate sexual contact with his younger half-sisters. He also testified that Mr. Pulham was placed in a behavioral counseling center, Benchmark Behavioral Health, for approximately thirty days after his sister, C.P., came forward with the allegations of abuse that the PSR referenced. According to

---

[2] Because the defendant and his father have the same last name, when referring to the father by his proper name, we will use his first and last name (i.e., "Terry Pulham") throughout; we will refer to the defendant as "Mr. Pulham."

Terry Pulham, Mr. Pulham was sent to Benchmark for an evaluation because he was "acting suicidal" due to C.P.'s allegations and "to see if he had those kind of tendencies." *Id.*, Vol. III, at 55–57.

S.J., one of Mr. Pulham's half sisters, briefly testified that she had no recollection of Mr. Pulham ever sexually abusing her when she was a child. She did, however, recall an incident in which her sister C.P. pulled her aside and told her to lie to her parents and tell them that Mr. Pulham was sexually abusing her and C.P. S.J. testified that she told her stepfather this fabricated story at C.P.'s prompting.

The government presented testimony from Agent Reinert, a special agent assigned to the Wyoming ICAC, who was the lead agent in the investigation of Mr. Pulham. Agent Reinert testified that she had interviewed both C.P. and J.H. by telephone in the runup to the sentencing hearing and that they had provided statements about Mr. Pulham's alleged sexual abuse, albeit statements not made under oath. C.P. told Agent Reinert that her relationship with Mr. Pulham had been "very sexually charged" and that childhood games with him would often take on a "sexual slant." *Id.* at 70. She also told Agent Reinert that Mr. Pulham acted as a "ring leader" among his siblings and their friends and would have the children "act out upon one another sexually and [he would] watch for his enjoyment, or would offer her up to his friends for sexual purposes . . . [and] watch them perform together." *Id.* C.P. recalled that from the ages of four through twelve her

6

interactions with Mr. Pulham were "sexual," and that the most egregious conduct he engaged in was to "spread the lips of her vagina and place his penis upon it." *Id.* Furthermore, in testifying about C.P.'s "affect" during the interview, Agent Reinert stated, "She was very emotional. There were several times . . . where we'd have to pause and she would need to collect herself. And she was very angry." *Id.* at 72.

As for J.H., Agent Reinert reported that J.H. claimed in her interview that Mr. Pulham had sexually abused her as a child. J.H. told Agent Reinert that Mr. Pulham had subjected her to significantly more abuse than the isolated incident that the PSR recorded. J.H. told Agent Reinert that over the course of two years Mr. Pulham progressed from forcing her to strip nude in front of him, to forcing her to perform oral sex on him, to eventually forcing her to engage in vaginal intercourse with him. Agent Reinert testified that J.H.'s oral "affect" reflected "[s]hock and disgust," and seemingly because the subject matter of the interview was disturbing to J.H., also "brevity." *Id.* at 75.

After hearing arguments from both counsel, the district court rejected Mr. Pulham's objection to the pattern-of-activity enhancement. In an oral ruling, the court found it was more probable than not that Mr. Pulham had engaged in "at least two" instances of sexual abuse or exploitation of minors. *Id.* at 93. The court noted that it did not find the witnesses presented by Mr. Pulham—i.e., Terry Pulham and S.J.—"particularly persuasive." *Id.* The court was, however,

7

persuaded by the fact that as adults C.P. and J.H. described similar misconduct by Mr. Pulham to Agent Reinert, and that their ages at the time of the alleged abuse correlated with each other and also with the images of children found on Mr. Pulham's computer which formed the basis of his conviction. *Id.* at 91.

The district court's exact language in reaching these sentencing findings bears on our resolution of this appeal and it therefore warrants reproduction here in salient part:

> The factors that seem persuasive to the Court in terms of the application of this enhancement are the—to begin with, the instance reported by [J.H.]. Whether that was one or more instances, we have someone of a particular age that correlates with the age of [C.P.], and it also correlates with the age of images found on the defendant's computer associated with this particular offense. The types of conduct detailed by two separate individuals [i.e., C.P. and J.H.] also is similar which seems to corroborate the stories.
>
> The testimony from [Terry] Pulham and [S.J.] is a bit indeterminant, and it is obvious that [S.J.] has made every effort to search her memory and doesn't—doesn't remember incidents. That's understandable. She was young.
>
> . . . .
>
> So the statements by the grown women, [J.H.] and [C.P.], the age that they were at correlate and it correlates with the images to which Mr. Pulham is attracted because of the offense conduct associated with child pornography. And so I believe that the—that it is more probable than not that the defendant engaged in a pattern of activity, which is at least two, involving the sexual abuse or exploitation of minors.

*Id.* at 92–93. In announcing its decision, the court also expressly adopted the

8

PSR's factual findings. Ultimately, it applied a three-level downward variance because it believed that "the additional five levels for [the pattern-of-activity enhancement] . . . seems particularly punitive considering the amount of years that have passed . . . since whatever – whatever happened back then." *Id.* at 112–13.

The district court did not make any further explicit findings regarding the conduct or incidents it relied on to support the enhancement. Nor did the court state its reasoning for tacitly concluding that the conduct at issue satisfied the Guidelines definition of "sexual abuse or exploitation." Notably, however, Mr. Pulham did not object to the absence of further factual findings or question whether the facts were adequate, as a matter of law, to support the pattern-of-activity enhancement. Mr. Pulham was sentenced to ninety-seven months' imprisonment, and this timely appeal followed.

**II**

Mr. Pulham advances two primary arguments on appeal. First, he argues that the district court committed plain legal error in applying the enhancement because the facts upon which the district court relied do not satisfy the definition of "sexual abuse or exploitation" set forth in § 2G2.2(b)(5) of the Guidelines. Second, Mr. Pulham argues that the district court committed clear error in finding that he qualified for § 2G2.2(b)(5)'s enhancement because the court relied on hearsay-laden facts that did not evince the requisite indicia of reliability. Both of these arguments turn on Mr. Pulham's foundational assertion that the *only* facts that the

9

district court relied on in applying the pattern-of-activity enhancement were the facts that the PSR recounted. We disagree, however, with this bedrock contention, and conclude instead that the district court—at least in principal part—based its determination regarding the pattern-of-activity enhancement on the facts adduced through the testimony of Agent Reinert. This disagreement with Mr. Pulham regarding the relevant factual universe helps to explain why we ultimately conclude that his two arguments on appeal are unpersuasive.

## A

Mr. Pulham's challenge to the pattern-of-activity enhancement "tests the 'procedural reasonableness' of his sentence, 'which requires, among other things, a properly calculated Guidelines range.'" *United States v. Cook*, 550 F.3d 1292, 1295 (10th Cir. 2008) (quoting *United States v. Smith*, 534 F.3d 1211, 1226 (10th Cir. 2008)). Generally, "we review a district court's legal interpretation of the Guidelines de novo and its factual findings for clear error." *Smith*, 534 F.3d at 1226. However, as to his first argument, Mr. Pulham concedes that he did not object to the district court's tacit legal determination that the facts before it satisfied the Guidelines definition of "sexual abuse or exploitation." The court necessarily had to make this determination before properly applying the pattern-of-activity enhancement. Accordingly, Mr. Pulham's first argument is reviewed under our rigorous plain-error standard. *See, e.g.*, *United States v. Martinez-Torres*, 795 F.3d 1233, 1236 (10th Cir. 2015).

10

Under the plain-error standard, (as relevant here) the forfeiting defendant must make a showing of "(1) error that is (2) plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012). "An error is 'plain' if it is 'clear or obvious' under 'current, well-settled law.'" *United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th Cir. 2011) (quoting *United States v. Whitney*, 229 F.3d 1296, 1308–09 (10th Cir. 2000)). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *Id.* (quoting *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003)). "But even where there is no such precedent, we may find plain error where the district court has engaged in a 'clearly erroneous' application of statutory law." *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011) (quoting *United States v. Poe*, 556 F.3d 1113, 1129 (10th Cir. 2009)).

"An error seriously affects the defendant's substantial rights, as those terms are used in the plain-error test, when the defendant demonstrates 'that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (quoting *United States v. Mendoza*, 698 F.3d 1303, 1310 (10th Cir. 2012)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008)).

11

**B**

Section 2G2.2(b)(5) of the Guidelines provides for a five-level enhancement if the defendant "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). The commentary to the Guidelines defines "pattern of activity" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant." U.S.S.G. § 2G2.2 cmt. n.1. Sexual abuse or exploitation has a specific meaning as used in this context: it encompasses only conduct that would constitute an offense under certain enumerated federal statutes. More specifically, sexual abuse or exploitation includes:

> (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)–(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under any such section if the offense had occurred within the special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subdivisions (A) or (B).

*Id.* Neither the PSR nor the district court in imposing sentence on Mr. Pulham identified which of the specific enumerated statutes applied to his alleged misconduct. On appeal, Mr. Pulham states that "[t]he only evident possibility, however, is 18 U.S.C. § 2241(c)," Aplt.'s Opening Br. at 10, and the government does not meaningfully contest this assertion, *see* Aplee.'s Resp. Br. at 15 (arguing that Mr. Pulham's conduct as to C.P. and J.H. is "prohibited by 18 U.S.C. § 2241"). That statute prohibits "knowingly engag[ing] in a sexual act with another person

12

who has not attained the age of 12 years." 18 U.S.C. § 2241(c). A "sexual act" is

defined as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . .

18 U.S.C. § 2246(2)(A)–(D).

## C

### 1

In our view, Mr. Pulham takes an unduly narrow view of the universe of

facts upon which the district court based its pattern-of-activity enhancement.

According to Mr. Pulham, because the district court expressly stated that it would

"accept the Presentence Report's findings of fact," Aplt.'s App., Vol. III, at 93, the

court relied on *only* those factual findings—and no others—in reaching its ultimate

finding that Mr. Pulham's conduct qualified for the pattern-of-activity

enhancement. The government disagrees. It contends that the court at least tacitly

13

relied in principal part on the facts adduced through Agent Reinert's hearing testimony in applying the enhancement. We are persuaded by the government's position. More specifically, we agree with the government's assertion that "the statements made to Agent Reinert to which she testified at the sentencing hearing expand, amplify, and clarify the information contained in the PSR." Aplee.'s Resp. Br. at 15–16. Contrary to Mr. Pulham's suggestion, this is not a situation where the Reinert-adduced facts "'contradicted' the information contained in the PSR," Aplt.'s Reply Br. at 3, regarding matters material to the district court's ultimate finding that Mr. Pulham's conduct qualified for the pattern-of-activity enhancement.[3] *Cf. United States v. Atencio*, 476 F.3d 1099, 1106 (10th Cir. 2007) (holding that the district court plainly erred in adopting the PSR and its Addendum without resolving materially "contradictory" findings as between the two documents, regarding whether the defendant regularly physically abused his

---

[3] Notably, though the district court expressly chose to "accept the Presentence Report's findings of fact," Aplt.'s App., Vol. III, at 93, that did not mean that its ultimate factual finding that Mr. Pulham's conduct qualified for the pattern-of-activity enhancement incorporated every single subsidiary PSR factual finding, or that the court's ultimate finding was not clearly informed by testimony at the sentencing hearing. In this regard, the PSR relied on Mr. Pulham's alleged abuse of S.J., in finding that there were "at least three hands-on victims in Utah." *Id.*, Vol. II, at 20. However, S.J.'s testimony at the sentencing hearing was—as the district court put it—"indeterminant" about such abuse, and accordingly, the district court's discussion of the factors that "seem[ed] persuasive to the Court" in applying the enhancement did not rely on S.J. as an alleged victim of Mr. Pulham's sexual abuse. *Id.*, Vol. III, at 92–93.

14

girlfriend), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008).

As we read the record, the district court's remarks at the sentencing hearing reveal that the court credited and relied (albeit tacitly) in principal part on Agent Reinert's testimony in imposing the enhancement. Significantly, the court expressly credited "the statements by the grown women, [J.H.] and [C.P.]," Aplt.'s App., Vol. III, at 93, and the only source of those statements was the testimony of Agent Reinert. In advancing a contrary position, Mr. Pulham points to isolated statements that the court uttered at the sentencing hearing. For example, Mr. Pulham places great weight on the court's use of the singular term "instance" in referring to the misconduct that J.H. reported. Mr. Pulham contends that, because J.H. reported *multiple instances* to Agent Reinert, the court must have been referring to the *single instance* described in the PSR. We are not persuaded. Immediately after its use of the singular term, the court acknowledged that there could have been more than one instance of sexual misconduct involving J.H. when it used the phrase, "[w]hether that was one or more instances." *Id.* at 92. Mr. Pulham also contends that "the court relied on what had been 'described *by the girls*[,]' . . . . demonstrat[ing] that its focus was the allegations recounted in the PSR." Aplt.'s Reply Br. at 3 (quoting Aplt.'s App., Vol. III, at 93). However, as noted, the court later referenced "the statements *by the grown women*," and, importantly, it did so immediately before concluding that "it [wa]s more probable

15

than not that the defendant engaged in a pattern of activity, which is at least two, involving the sexual abuse or exploitation of minors." Aplt.'s App., Vol. III, at 93 (emphasis added).

Ultimately, the burden falls on Mr. Pulham to demonstrate error based on the record. The isolated comments that he identifies do little to help him carry that burden because, as demonstrated, each comment in the record that arguably suggests that the district court relied—as a matter of historical fact—*solely* on the PSR's factual findings is met by other comments by the district court that indicate to the contrary. On balance, we believe the record fairly supports the conclusion that the district court credited the facts adduced through Agent Reinert's testimony and relied on them in principal part to support the enhancement.

Moreover, even if the isolated comments that Mr. Pulham identified caused us to perceive some arguable ambiguity in the record regarding the district court's actions when it made its factual findings, that circumstance of arguable uncertainty would not avail Mr. Pulham. As explicated *infra*, Part D.1, there is no disagreement among the parties that, if the district court had relied solely on the facts recounted in the PSR in applying the pattern-of-activity enhancement, the court clearly would have committed legal error because those facts, standing alone, do not satisfy the definition of "sexual abuse or exploitation" under § 2G2.2(b)(5) of the Guidelines. Under our "background legal norms," if there was some arguable ambiguity in the record regarding whether the district court had relied on

16

the PSR's findings in this prohibited manner, we naturally would adopt an interpretation of the record—if we reasonably could do so—that presumed that the court was aware of the law and followed it. *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007) ("We traditionally presume, absent some indication in the record suggesting otherwise, that '[t]rial judges are presumed to know the law and apply it in making their decisions.'" (quoting *United States v. Russell*, 109 F.3d 1503, 1512–13 (10th Cir. 1997))); *accord United States v. Chavez-Meza*, 854 F.3d 655, 659 (10th Cir. 2017), *cert. granted*, --- U.S. ----, 138 S. Ct. 734 (2018). That is, we would read the record as indicating that the court did not impermissibly rest its pattern-of-activity enhancement *solely* on the PSR's factual findings.

There is no "indication in the record" that applying this presumption here would be inappropriate. *Ruiz-Terrazas*, 477 F.3d at 1201. This is especially true because it would be entirely reasonable—at the very least—to discern from the district court's comments that it credited Agent Reinert's testimony and relied in principal part on the facts adduced through that testimony in ruling that Mr. Pulham's conduct qualified for the pattern-of-activity enhancement. Accordingly, we reject Mr. Pulham's unduly narrow reading of the relevant factual universe upon which the district court based the enhancement.

## 2

We have thus rejected Mr. Pulham's contention for why we should resolve

17

his two challenges to his sentence based on a consideration of *only* the PSR's factual findings, *viz.*, his contention that the district court—as a matter of historical fact—only relied on the PSR's factual findings in applying the pattern-of-activity enhancement. However, reading his briefing with a very generous eye, we note that Mr. Pulham also might be advancing a legal contention for why our review of his challenges should be restricted to the PSR's findings. Citing our decision in *United States v. Underwood*, 938 F.2d 1086 (10th Cir. 1991), Mr. Pulham could be arguing that, because the district court did not make any specific and explicit factual findings regarding its reliance on the facts adduced through Agent Reinert's testimony to support the pattern-of-activity enhancement, we are legally obliged to restrict our review to the only facts that the court *did* specifically and explicitly adopt—that is, the PSR's findings. Under the rationale of this argument, this limitation on the scope of our review would exist even if the district court—as a matter of historical fact—*tacitly* credited and relied upon the Reinert-adduced facts.

If Mr. Pulham is actually making such a legal argument, his initial threshold, and ultimately dispositive, problem is that, not only did he not make this precise argument before the district court, he did not even make a related challenge to the adequacy of the district court's factual findings. Therefore, Mr. Pulham has forfeited any such legal argument. *See, e.g.*, *United States v. Uscanga-Mora*, 562 F.3d 1289, 1293 (10th Cir. 2009) ("Because Mr. Uscanga-Mora did not alert the district court that he considered its statement of reasons for issuing the

18

enhancement inadequate, his claim for relief on this procedural ground has been forfeited."). And, because Mr. Pulham has not argued for plain-error review of this argument on appeal, he has waived our review of it. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court.").

In any event, on the merits, Mr. Pulham's legal argument would fail. In the portion of *Underwood* cited by Mr. Pulham, we simply held that "at a minimum, the [sentencing] court must make a finding that the requirements for the [Guidelines] adjustment [e.g., enhancement] have been satisfied." *Underwood*, 938 F.2d at 1091. By its plain terms, this language from *Underwood* hardly lends support to the legal argument that we generously divined from Mr. Pulham's briefing. Nor does the language of our other controlling caselaw.

Indeed, as *Underwood* itself recognizes, "our cases clearly do not require the district court to make particularized findings for guidelines adjustments." *Id.* In other words, a district court is not obliged in our circuit to make *any* specific findings regarding the basis for its ultimate determination that "the requirements for the adjustment have been satisfied." *United States v. Montoan-Herrera*, 351 F.3d 462, 466 (10th Cir. 2003) (quoting *Underwood*, 938 F.2d at 1091). Although a district court must make a finding that a guideline adjustment applies, that finding "need not be particularized." *Id.*; *see United States v. Caruth*, 930 F.2d

19

811, 816 (10th Cir. 1991) ("Caruth argues that the district court failed to make sufficient findings of fact about his status. However, we have only required district courts to make findings and explain their reasoning with respect to *departures* under the Guidelines. 'When *adjustments* under the guidelines are involved, a trial court is in no way required to make detailed findings, or explain why a particular adjustment is or is not appropriate.'" (emphasis added) (quoting *United States v. Maldonado-Campos*, 920 F.2d 714, 718 (10th Cir. 1990))); *United States v. Donaldson*, 915 F.2d 612, 615 (10th Cir. 1990) (affirming sentence where "the district court refused to state the basis for its finding" of fact that defendant was not a minor participant, and stating that, "[a]lthough it would more clearly inform the defendant and help on appellate review if the district judge would state why he found as he did, there is no legal requirement that the judge state reasons for his finding of fact"); *cf. Montoan-Herrera*, 351 F.3d at 466–67 (noting that "the finding for an adjustment need not be particularized," but vacating defendant's sentence because the "district court did not state what the adjustment was for nor did it make a finding that the requirements for the adjustment were satisfied"). Accordingly, insofar as Mr. Pulham is arguing that we are *legally* precluded from considering the Reinert-adduced facts in resolving his two sentencing challenges because the district court did not make specific findings adopting those facts, even if this argument were not waived (which it is), we would reject it.

**D**

20

The foregoing analysis has laid the groundwork for our resolution of Mr. Pulham's two sentencing challenges. Contrary to Mr. Pulham's bedrock premise underlying those challenges, we may consider in our review not only the PSR's factual findings, but also the facts adduced through the testimony of Agent Reinert. With this factual universe in mind, we address Mr. Pulham's two arguments.

**1**

Mr. Pulham's first argument advances a legal challenge under the rigorous plain-error standard of review. He contends that the district court committed plain legal error in applying the enhancement because the facts upon which the district court relied do not satisfy the definition of "sexual abuse or exploitation" set forth in § 2G2.2(b)(5) of the Guidelines. In response, the government admits that "the conduct described in the PSR does not fit the definition of sexual abuse or exploitation as set forth in the guideline," but vigorously insists that there is "substantial evidence in the record which clearly *does* support the imposition of the pattern of activity enhancement." Aplee.'s Resp. Br. at 12 (emphasis added). We believe that the government has the stronger hand. In particular, we conclude that the facts adduced through Agent Reinert's testimony patently clear the legal hurdle of § 2G2.2(b)(5)'s definition of sexual abuse or exploitation.

First of all, Mr. Pulham must confront an issue of waiver. He has adopted an all-or-nothing approach with respect to his contention—which we have deemed erroneous—that the district court relied *solely* on the PSR's factual findings in

21

support of the pattern-of-activity enhancement. As an apparent consequence of this strategic decision, Mr. Pulham has not attempted to argue (even alternatively) that the court would have plainly erred by relying on other evidence in the record as grounds for the enhancement. Notably, he has not argued that the facts adduced through Agent Reinert's testimony are legally insufficient because they do not satisfy § 2G2.2(b)(5)'s definition of "sexual abuse or exploitation." In other words, his briefing offers no retort to the government's position that other record evidence extending beyond the PSR's findings—notably, the Reinert-adduced facts—was sufficient to meet this Guidelines definition. In short, apparently because of his all-or-nothing approach regarding the relevant universe of facts, Mr. Pulham fires at the wrong target.

It behooved Mr. Pulham, however, to have a backup plan. In other words, to establish that the district court plainly erred in imposing the enhancement, he was obliged not only to mount his legal challenge with respect to the factual universe he believed to exist, but also with respect to other plausible factual scenarios that could be advanced to support the court's enhancement. *Cf. United States v. Davis*, 339 F.3d 1223, 1227 (10th Cir. 2003) (noting that we may affirm convictions on "any ground that finds support in the record"). Moreover, it is well-settled doctrine that "[f]ailure to raise an issue in the opening appellate brief waives that issue." *United States v. Black*, 369 F.3d 1171, 1176 (10th Cir. 2004); *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments

22

inadequately briefed in the opening brief are waived."). Accordingly, we would be free to deem this legal, plain-error argument that Mr. Pulham has vigorously—but single-mindedly—directed at the district court's reliance on the PSR's factual findings to be waived as applied to the court's reliance *on other record evidence*, saliently, the Reinert-adduced facts. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

Even were we to overlook this waiver, however, we would conclude that Mr. Pulham's legal, plain-error argument is without merit. Put simply, there is no error, much less clear or obvious error. The facts adduced through Agent Reinert's testimony—taken at face value—clearly satisfied § 2G2.2(b)(5)'s definition of "sexual abuse or exploitation."[4] More specifically, these facts conveyed that Mr. Pulham established a pattern of "knowingly engag[ing] in a sexual act with another person who ha[d] not attained the age of 12 years." 18 U.S.C. § 2241(c).

Agent Reinert testified regarding specific conduct by Mr. Pulham that clearly constituted repeated sexual acts with someone under the age of twelve. Agent

---

[4] For purposes of resolving Mr. Pulham's plain-error challenge, we assume that the Reinert-adduced facts could be properly considered by the district court because they bear sufficient indicia of reliability. Mr. Pulham's challenge here is purely a legal one and does not dispute the quality of the factual evidence. The question here is simply whether the district court plainly erred in concluding that the relevant facts satisfied § 2G2.2(b)(5)'s definition of "sexual abuse or exploitation." And we answer that question in the negative. We address Mr. Pulham's concerns about the reliability of the record evidence *infra* in Part II.D.2.

23

Reinert testified that J.H. said that Mr. Pulham made her "perform oral sex upon him"[5] and made her "engage in vaginal intercourse with him."[6]  Aplt.'s App., Vol. III, at 75.  This testimony alone would qualify as a pattern of activity under § 2G2.2(b)(5) because J.H. described at least two instances of sexual abuse or exploitation.[7]  Moreover, Agent Reinert testified that C.P. said, when she was between the ages of four and twelve, Mr. Pulham (among other things) engaged in an "egregious" sexual act with her; he "spread the lips of her vagina and place[d] his penis upon it."  Aplt.'s App., Vol. III, at 70.  This constitutes another sexual act that patently satisfies § 2G2.2(b)(5)'s definition of "sexual abuse or exploitation."  *See* 18 U.S.C. § 2246(2)(D).

Therefore, the Reinert-adduced facts were legally sufficient to support the five-level pattern-of-activity enhancement, even though it is undisputed that the PSR's factual findings, standing alone, were not.  Thus, even were we to overlook Mr. Pulham's waiver of his plain-error argument, as it pertains to the facts adduced through Agent Reinert's testimony, he could not establish that the district court

---

[5]     A "sexual act" includes "contact between the mouth and the penis." 18 U.S.C. § 2246(2)(B).

[6]     A "sexual act" includes "contact between the penis and the vulva . . . , and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight."  18 U.S.C. § 2246(2)(A).

[7]     According to the commentary to § 2G2.2, a "pattern of activity" includes "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation . . . involved the same minor."  U.S.S.G. § 2G2.2 cmt. n.1.

24

committed error, let alone clear or obvious error, in determining that the record evidence was legally sufficient to satisfy § 2G2.2(b)(5)'s definition of "sexual abuse or exploitation."

**2**

Second, Mr. Pulham argues that the district court committed clear error in finding that he qualified for § 2G2.2(b)(5)'s enhancement because the court relied on facts permeated by hearsay that did not evince the requisite indicia of reliability. For the reasons noted below, we reject this argument.

We begin by underscoring the deferential nature of the clearly-erroneous standard of review. "To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995); *see United States v. Proffit*, 304 F.3d 1001, 1009 (10th Cir. 2002) (noting, as to a Guidelines sentencing challenge, that the defendant "must clear the difficult hurdle of clearly erroneous review"). "Pursuant to the clearly erroneous standard, a trial judge's findings of fact are presumptively correct." Harry T. Edwards & Linda A. Elliott, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT AND AGENCY DECISIONS, ch. II, Westlaw (database updated Feb. 2018); *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984) (discussing "the presumption of correctness that attaches to factual

25

findings"). Under this standard, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, --- U.S. ----, 137 S. Ct. 1455, 1465 (2017) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). "In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 400 (1990). At bottom, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also United States v. Pool*, 937 F.2d 1528, 1530 (10th Cir. 1991) ("We review factual findings underlying upward adjustments with deference, overturning them only upon a determination that the findings were clearly erroneous or without factual support in the record such that our review leaves us with the firm and definite conviction that a mistake has been made.").

Therefore, we must ask here whether we are definitely and firmly convinced that the district court erred in finding that it was more likely than not on this record—under a preponderance-of-the-evidence standard—that Mr. Pulham qualified for the pattern-of-activity enhancement. *See* Edwards & Elliott, *supra*, ch. II ("[I]mportantly, in applying the clearly erroneous standard, a reviewing court must take account of the standard of proof informing the trial court's factual

26

finding."); *see also United States v. Rice*, 52 F.3d 843, 848 (10th Cir. 1995) (noting that "the government bears the burden of proof for sentence increases" by a "preponderance of the evidence"). Mr. Pulham contends that he can prevail, even under this deferential standard, because the evidence on which the district court based its pattern-of-activity enhancement did not evince minimal indicia of reliability.

District courts are not bound by the Federal Rules of Evidence when sentencing a defendant. *See, e.g.*, *United States v. Ruby*, 706 F.3d 1221, 1229 (10th Cir. 2013); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 6A1.3 cmt. ("In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial."). Rather, courts may consider any information that contains "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Thus, a district court may rely on hearsay statements at sentencing without violating a defendant's due process rights,[8] so

---

[8]     *See generally* FED. R. EVID. 801(c) (defining hearsay as "a statement that . . . the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement"); *accord United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993). Mr. Pulham concedes, as he must, that the court's reliance on hearsay evidence was not a per se
(continued...)

27

long as the statements bear "some minimal indicia of reliability." *Cook*, 550 F.3d at 1296 (quoting *United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995)); *see also United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990) ("As it pertains to hearsay information, due process requires that the information used have 'some minimal indicium of reliability beyond mere allegation.'" (quoting *United States v. Sunrhodes*, 831 F.2d 1537, 1542 (10th Cir. 1987))); U.S.S.G. § 6A1.3 cmt. ("Reliable hearsay evidence may be considered.").

A "district court [can even] rely on double hearsay as long as the statements contained minimal indicia of reliability." *United States v. Basnett*, 735 F.3d 1255, 1261 (10th Cir. 2013). "Corroborating evidence is often key to determining whether a statement is sufficiently reliable." *Ruby*, 706 F.3d at 1229; *accord United States v. Jones*, 818 F.3d 1091, 1098 n.4 (10th Cir. 2016); *see United States v. Caiba-Antele*, 705 F.3d 1162, 1166 (10th Cir. 2012) (finding sufficient indicia of reliability in corroborating statements given to detectives by multiple victims of sexual abuse); *see also United States v. Robey*, 120 F.3d 271, 1997 WL 44732697, at *4 (10th Cir. 1997) (unpublished) ("In this case, we believe the record sufficiently corroborates the hearsay statements relied upon in the PSR to provide a minimal indicia of reliability.").

At the outset, as with his plain-error challenge, Mr. Pulham's argument falters on waiver grounds. As noted, we have determined that the district court not only adopted the

---

[8](...continued)
violation of his rights. Rather, he challenges the reliability of that hearsay evidence.

28

PSR's factual findings, but also relied (necessarily) in principal part on the facts adduced through Agent Reinert's testimony to support its pattern-of-activity enhancement. This testimony was undisputedly hearsay, as the testimony communicated for their truth the statements of C.P. and J.H. Yet, in his opening brief, Mr. Pulham never contends that the district court clearly erred insofar as it relied on Agent Reinert's testimony as an independent basis for the enhancement because it was unreliable hearsay. Instead, consistent with his theory that the district court based the enhancement *solely* on the PSR's factual findings, Mr. Pulham simply argues that Agent Reinert's testimony could not *corroborate the findings in the PSR*. *See* Aplt.'s Opening Br. at 22 ("[T]he hearsay statements relayed by Agent Reinert simply were not sufficiently corroborative of the separate hearsay statements recounted in the PSR."); *cf. id.* at 8 (arguing that "the district court clearly erred *in accepting the allegations recited in the PSR*" (emphasis added)). The PSR's factual findings were undisputedly problematic because they were "based on multiple layers of hearsay." Aplt.'s Opening Br. at 19 & n.7;[9] *see United States v. Lloyd*, 566 F.3d 341, 344 (3d Cir. 2009) (noting that "out-of-court statements . . . containing multiple layers of hearsay have been recognized as unreliable" (citations omitted));

---

[9] Mr. Pulham succinctly underscores his argument in this regard, noting for example as to J.H., the following: "With respect to the alleged incident involving J.H. recounted in the PSR, there were at least three levels of hearsay—J.H. to her mother to the preparer of the child services report to the report itself . . . ." Aplt.'s Opening Br. at 19 n.7.

29

*accord Crawford v. Jackson*, 323 F.3d 123, 129 (D.C. Cir. 2003) (noting, in the parole revocation context, that "police statements are less reliable to the extent that they . . . contain multiple layers of hearsay" (citations omitted)). But, even assuming that Agent Reinert's testimony was incapable of performing the Herculean task of corroborating the PSR's hearsay-laden findings, that does not tell us much about whether that testimony, *standing alone*, was sufficiently reliable to support the district court's pattern-of-activity enhancement. And Mr. Pulham expresses no view on that subject in his opening brief. Thus, by basing his hearsay-reliability argument solely on the PSR's findings, Mr. Pulham has ignored the possibility that other evidence in the record—notably, Agent Reinert's testimony—was sufficiently reliable to independently support the district court's pattern-of-activity enhancement.

Accordingly, in our view, Mr. Pulham has waived a hearsay-reliability argument insofar as it would pertain to whether the district court's pattern-of-activity enhancement could be properly grounded on Agent Reinert's admittedly hearsay testimony. *See, e.g.*, *Black*, 369 F.3d at 1176; *Adler*, 144 F.3d at 679. To be sure, in his reply brief, Mr. Pulham argues for the first time that Agent Reinert's testimony was not sufficiently reliable to "independently support application of the pattern enhancement." Aplt.'s Reply Br. at 12. But, significantly, he acknowledges that this was *not* an argument that he presented in his opening brief. *See id.* at 7 (noting that "[i]n his opening brief, Mr. Pulham argued that the double-

30

and triple-hearsay statements in the PSR" were not sufficiently reliable). Arguments made for the first time in reply briefs come too late. *See, e.g.*, *White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017) (noting that the party "waived []his contention by waiting to present it for the first time in his reply brief"); *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002) ("Nor do we consider arguments raised for the first time in a reply brief."). Accordingly, Mr. Pulham's assertion for the first time in his reply brief of a hearsay-reliability challenge to Agent Reinert's testimony, as an independent basis for the pattern-of-activity enhancement, will not rescue this challenge from waiver.

Even were we inclined to exercise our discretion to overlook this waiver and apply Mr. Pulham's hearsay-reliability argument to Agent Reinert's testimony—as a possible independent basis for the enhancement—we would still conclude that Mr. Pulham cannot prevail. Under our precedent, the indicia of reliability associated with Agent Reinert's testimony is admittedly limited. But we ultimately conclude that this testimony was sufficiently reliable for the district court to consider in determining the applicability of the pattern-of-activity enhancement and that it provided an adequate factual basis for that enhancement. In short, we are not definitely and firmly convinced that the district court erred in finding that it was more likely than not that Mr. Pulham qualified for the pattern-of-activity enhancement.

A "key" factor in our determination is the corroboration for the hearsay

31

statements of C.P. and J.H. *Ruby*, 706 F.3d at 1229. First, as the district court noted, the separate and independent statements of C.P. and J.H. (offered through Agent Reinert's testimony) had the effect of corroborating each other. They described roughly similar sexual acts that Mr. Pulham allegedly caused them to engage in when they were approximately the same age. We have previously recognized the corroborative force of such similar statements. For instance, in *Caiba-Antele*, we noted that the independent accounts of three children who accused the defendant of sexually assaulting them added reliability to the hearsay statements of the children because "the testimony of each victim . . . corroborated the type and instances of abuse the other children said were perpetrated against them." 705 F.3d at 1166; *see also Cook*, 550 F.3d at 1297 (finding that the statements of "two witnesses" regarding the same firearms-related felonious incident had a corroborative effect in support of a Guidelines enhancement relating to possessing or using a firearm in connection with another felony offense). And, contrary to Mr. Pulham's suggestion, the statements of C.P. and J.H. could serve to corroborate each other even though the two women "did not refer to" or "mention" each other and the statements did not relate to the same "specific incident." Aplt.'s Reply Br. at 10–11 (italics omitted); *see Caiba-Antele*, 705 F.3d at 1166 (finding corroboration in witness statements that were merely similar in "type and instances of abuse" by the defendant).

Second, as the district court found, and the government stresses,

32

corroboration or validation of the statements of C.P. and J.H. can also be found in the fact that their ages at the time of Mr. Pulham's alleged sexual abuse were "consistent with the child pornography [Mr. Pulham] collected" (i.e., C.P. and J.H. were prepubescent girls at the time of the alleged abuse and a majority of the images and videos seized from Mr. Pulham, which formed the basis of his conviction, depicted prepubescent children). Aplee.'s Resp. Br. at 21. More specifically, the district court found that the hearsay statements of C.P. and J.H. were reliable in part because—at the time Mr. Pulham perpetrated the alleged sexual conduct on them—both women were of a similar age to the children depicted in the pornographic material that led to Mr. Pulham's conviction.

The district court would not have been unreasonable in discerning from these particular circumstances of Mr. Pulham's conviction that he harbors a lingering sexual interest in children. *See, e.g.*, *United States v. Byrd*, 31 F.3d 1329, 1339 & n.9 (5th Cir. 1994) ("In addition to citing the case law and expert testimony that links pedophilia to child pornography, we also note that common sense would indicate that a person who is sexually interested in children is likely to also be inclined, i.e., predisposed, to order and receive child pornography."); *United States v. Bentley*, 475 F. Supp. 2d 852, 858 (N.D. Iowa 2007) ("The child pornographer, like the child rapist, displays a sexual interest in children."), *aff'd*, 561 F.3d 803 (8th Cir. 2009). And this, in turn, would have bolstered the reliability of C.P.'s and J.H.'s allegations of prepubescent sexual abuse. *See Ruby*, 706 F.3d at 1230

33

(finding that defendant's prior conviction for assaulting his girlfriend "may help establish another piece of the 'minimal indicia of reliability' necessary to consider [her hearsay statement] at sentencing" regarding similar assaultive conduct). Despite Mr. Pulham's suggestion that such an analytical approach amounts to "sweeping," legally objectionable "bootstrapping," of his conviction to support a Guidelines enhancement, Aplt.'s Reply Br. at 11, there ordinarily is no limit "on the information concerning the background, *character*, and *conduct* of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphases added). And there is no provision in the Guidelines or other law barring a court from considering a child-pornography conviction in determining the applicability of a pattern-of-activity enhancement.

Moreover, certain characteristics of the women themselves and the circumstances surrounding their statements to Agent Reinert could have appreciably bolstered the reliability of their statements in the eyes of the district court. As the government noted, when they made their statements, C.P. and J.H. were "adults . . . who presumably understood the import of their statements," Aplee.'s Resp. Br. at 11—more specifically, who presumably understood that allegations of sexual abuse are very serious and should be made with circumspection and care and probably also that adverse ramifications may befall

34

those who lie to law enforcement about such allegations.[10] *Cf. Florida v. J.L.*, 529

U.S. 266, 270 (2000) (discussing the categorical reliability of "a tip from a known

informant" because he or she "can be held responsible if her allegations turn out to

be fabricated"); *United States v. Johnson*, 364 F.3d 1185, 1190 (10th Cir. 2004)

("A tipster who refuses to identify himself may simply be making up the story,

perhaps trying to use the police to harass another citizen."). The court took

specific note of the fact that C.P. and J.H. were "grown women" when they made

their statements. Aplt.'s App., Vol. III, at 93. Furthermore, though C.P. and J.H.

were, by their own accounts, victims of Mr. Pulham, there is no suggestion that

they "had reasons to lie," *Ruby*, 706 F.3d at 1230 (counting the victim's daughter

among the "three relatively neutral witnesses"), or "had a dishonest motive."

*United States v. Dickerson*, 678 F. App'x 706, 714 (10th Cir. 2017) (unpublished).

In this regard, the clear indication from Agent Reinert's testimony is that she

initiated communications with C.P. and J.H. in the runup to the hearing; in other

words, they apparently did not reach out to Agent Reinert "with an axe to grind"

against Mr. Pulham and with the intent to harm him. *Ruby*, 706 F.3d at 1230.

Consistent with this view, Agent Reinert testified that, though she succeeded in

---

[10]    Indeed, at the time she was interviewed by Agent Reinert, C.P. held a law-enforcement-related job herself; she was "a correctional officer in a juvenile detention facility." Aplt.'s App., Vol. III, at 69. And, notably, J.H. also held a responsible government position that presumably would have sensitized her to the possible adverse ramifications of lying to law enforcement; J.H. was "a soldier in the U.S. Army and ha[d] been for the past 12 years" at the time of the interview. *Id.* at 74.

35

contacting J.H. for the pre-hearing interview, it was not "the first time" that she had "attempted to reach" J.H.  Aplt.'s App., Vol. III, at 73.

Lastly, though Agent Reinert did not conduct in-person interviews of C.P. and J.H., but rather spoke to them on the telephone, Agent Reinert did provide the district court with testimony regarding her impressions of the oral demeanor and attitude of C.P. and J.H.  And the court reasonably could have viewed this testimony as appreciably bolstering the reliability of the women's hearsay statements.  That is because C.P. and J.H. acted on the telephone like a reasonable person might expect them to act, if the two had in fact been sexually abused as prepubescent minors by Mr. Pulham.  For example, in testifying about C.P.'s "affect" during the interview, Agent Reinert stated, "She was very emotional. There were several times . . . where we'd have to pause and she would need to collect herself.  And she was very angry."  *Id.* at 72.  And offering similar testimony regarding J.H., Agent Reinert observed that she displayed "[s]hock and disgust," and seemingly because the subject matter of the interview was disturbing to her, "brevity."  *Id.* at 73.

It is not lost on us that, under our precedent, the reliability of the hearsay statements of C.P. and J.H. was seriously undermined by the fact that they were "[u]nsworn out-of-court statements" made by witnesses that the testifying agent "did not have an opportunity to [visually] observe" and assess their "demeanor," and "therefore could not," based on such visual observations, "form any opinion as

36

to [their] veracity." *United States v. Fennell*, 65 F.3d 812, 814 (10th Cir. 1995);

*see United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993) (holding that

unsworn, out-of-court statements "must have 'sufficient corroboration by other

means'" to form the basis for an enhancement (quoting U.S.S.G. § 6A1.3 cmt.));

*see also Cook*, 550 F.3d at 1296 (discussing *Fennell*'s holding regarding

unobserved witnesses); *United States v. Mullins*, 632 F. App'x 499, 507 (10th Cir.

2015) (unpublished) (discussing *Fennell*'s holding, and basing a pattern-of-activity

enhancement on the hearsay statements of a witness that the officers "personally

interviewed . . . and thus could observe his demeanor and form opinions as to his

veracity"); *United States v. Wilson*, 95 F. App'x 970, 976 (10th Cir. 2004)

(unpublished) (noting that hearsay statement taken telephonically "arguably lacks a

minimal indicia of reliability" because the testifying witness "could not observe

[the declarant's] demeanor to form an opinion as to the veracity of her

statements"), *cert. granted*, *judgment vacated on other grounds sub nom. Wilson v.

United States*, 543 U.S. 1103 (2005).

The seminal case in the Tenth Circuit regarding the reliability weaknesses of

unsworn statements derived from telephonic interviews—which Mr. Pulham does

cite—is *Fennell*. There, the district court imposed a sentencing enhancement under

Guidelines § 2K2.1(b)(5) on the defendant because he allegedly "had used his

machine gun in connection with a felonious assault." 65 F.3d at 813. But we

reversed. Describing the procedural circumstances, we stated:

> The district court found by a preponderance of the evidence that Mr. Fennell had fired his machine gun at his former girlfriend—an act which admittedly would constitute a felony within the meaning of § 2K2.1(b)(5). The district court based its finding upon the presentence report [i.e., PSR] and upon the testimony of the probation officer who prepared that report. The report and the accompanying testimony, in turn, simply recounted statements made by the girlfriend to the preparing officer during a telephone interview. In essence, then, the district court's finding was based upon hearsay evidence.

*Id.* We stressed that the PSR's enhancement—which the district court accepted—"was based *solely* upon unsworn allegations made by the [former] girlfriend during the telephone interview." *Id.* In our view, due to the unsworn nature of the former girlfriend's statement, and the telephonic means by which the probation officer obtained it—which deprived the officer of "an opportunity to observe her demeanor" and to "form any opinion as to her veracity"—the statement had "almost [a] total absence of indicia of reliability." *Id.* We therefore held that it was "an insufficient predicate for a sentence enhancement." *Id.* at 814.

We conclude, however, that *Fennell* (as well as its progeny) is distinguishable from the circumstances of this case. First, unlike *Fennell*, the statements at issue, of C.P. and J.H., were not "unsupported by other evidence" that would corroborate them. *Id.* As noted, each statement—which described roughly similar sexual acts that Mr. Pulham allegedly caused the women to engage in, when they were approximately the

38

same age—served to corroborate and bolster the reliability of the other. Moreover, the district court could have reasonably inferred from the particular circumstances of Mr. Pulham's child-pornography conviction—which was based on his possession of images of prepubescent children—that he harbored a lingering sexual interest in young children that could manifest itself in sexual abuse. These circumstances could have reasonably corroborated, and reinforced the reliability of, the hearsay statements of C.P. and J.H. regarding their prepubescent sexual abuse at the hands of Mr. Pulham.

Second, in *Fennell*, we tacitly recognized that "the [former] girlfriend may have had a reason to lie based on her previous relationship with the defendant." *Dickerson*, 678 F. App'x at 714. In contrast here, though they were alleged victims of Mr. Pulham, there is no suggestion that C.P. and J.H. "had reasons to lie," *Ruby*, 706 F.3d at 1230 (counting the victim's daughter among the "three relatively neutral witnesses"), or "had a dishonest motive," *Dickerson*, 678 F. App'x at 714.

Lastly, unlike the sentencing court in *Fennell*, the district court here was *not* entirely bereft of evidence bearing on the demeanor of the witnesses providing the out-of-court statements. Though she did not conduct in-person interviews of C.P. and J.H., Agent Reinert did glean in her telephonic interviews of the two women impressions that—while admittedly lacking the

39

optimal clarity of in-person, visual observations—offered significant clues regarding the women's demeanor. Agent Reinert testified, in effect, that C.P. and J.H. acted on the telephone like a reasonable person might expect them to act, if the two had in fact been sexually abused as prepubescent minors by Mr. Pulham. And, thus, the district court reasonably could have viewed Agent Reinert's testimony as appreciably bolstering the reliability of the two women's statements. In contrast, the sentencing court in *Fennell* had no such means of adding to "the almost total absence of indicia of reliability" of the former girlfriend's statement. *Id.*

Thus, as we did in *Cook*, we conclude that "[t]hese differences [from *Fennell*] are sufficient to vest some minimal confidence in the reliability of the hearsay statements before the district court," and therefore "hold that the district court did not clearly err in relying on them." 550 F.3d at 1297.

*** 

In sum, even if we were inclined to overlook Mr. Pulham's waiver of his hearsay-reliability argument as to the testimony of Agent Reinert, as an independent basis for the pattern-of-activity enhancement, we would conclude that this argument fails on the merits.

**III**

For the foregoing reasons, we **AFFIRM** the district court's sentencing order, finding that Mr. Pulham qualified for § 2G2.2(b)(5)'s pattern-of-

40

activity enhancement.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

16-8019 – *United States v. Pulham*

**HARTZ,** Circuit Judge, dissenting:

I respectfully dissent. In my view, this is just the type of case for which plain-error review is suited. It is apparent from the record that during the sentencing hearing no one—not the probation office, defense counsel, the prosecutor, or the district court—had a correct understanding of the meaning of "sexual abuse or exploitation of a minor" in USSG § 2G2.2(b)(5). As a result, the court made an indisputable legal error in determining whether Defendant was subject to an offense-level enhancement under that guideline. We must therefore reverse the sentence and remand for further proceedings. *See United States v. McKibbon,* 878 F.3d 967, 977–78 (10th Cir. 2017). The majority of this panel disagrees. But perhaps Defendant can get the same relief through a motion under 28 U.S.C. § 2255 complaining that his counsel was ineffective for failing to bring to the attention of the district court that the presentence report (PSR) had misinterpreted the guideline. If the district court finds what I am convinced of—that the enhancement was based on an incorrect interpretation of the guideline—then it would likely grant relief.

USSG § 2G2.2(b)(5) states: "If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by 5 levels." Application note 1 to the guideline defines *sexual abuse or exploitation* to include conduct described in several federal criminal statutes. The parties agree that the only applicable statute was 18 U.S.C. § 2241(c), which prohibits "knowingly engag[ing] in a sexual act with another

person who has not attained the age of 12 years." The term *sexual act* is defined in

18 U.S.C. § 2246(2) as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

This is a rather narrow definition of *sexual abuse or exploitation*. Common usage

would include much less egregious misconduct, and it is apparent that all those

participating in Defendant's sentencing were thinking in terms of common usage.

After Defendant pleaded guilty to possession of child pornography, the probation

office uncovered allegations of sexual misconduct against Defendant when he was a

juvenile. *See* R. at 140, 177–78. The PSR summarized those allegations as follows:

> The defendant has a juvenile rap sheet . . . reflecting an arrest on February 1, 1989, by the Payson Police Department, Payson, Utah, for Forcible Sexual Abuse of a Child Under Age 14. The matter did not result in a juvenile delinquency adjudication. He was placed in extended counseling.
> Records from the Utah Department of Human Services indicate that his sister, 13-year-old [CP], told her mother the defendant "raped" her and her six-year-old sister, [SP]. Interviews were conducted with both [CP] and [SP]. [CP] said she remembered being victimized as early as age 6, but primarily between the ages of 8-10 years old. She said he had full sexual intercourse with her, but a medical interview with a doctor revealed she was not a victim of sexual intercourse, but was fondled repeatedly. She also described an event when the defendant and a friend [apparently the brother

2

of another alleged victim, JH] were locked in the defendant's bedroom with [SP]. [CP] tried to get the door open, but had to summon her father's assistance. When she was able to ask [SP] what happened, she said they made her take her clothes off.

Another victim was [JH]. The [H] family and the defendant's family attended LDS church together, and the families lived near each other. [JH]'s mother advised Utah Child Protective Services that [JH] was visiting the Pulham home, when [Defendant] asked her to remove her clothing. He was 15 and she was age 10. He grabbed her between the legs and fondled her breasts. She ran home, and her mother did not let her go to the Pulham residence any more. This event was reported on March 3, 1988.
***

The Probation Officer spoke with [CP], who verified that she, her sister [SP], and a friend, [JH], had been victimized sexually by the defendant. Her father, Terry Pulham, has related to her the first time he observed inappropriate sexual contact between [CP] and the defendant occurred when [CP] was four years old and the defendant was seven years old. [CP] said she believes the defendant was himself victimized by one of her mother's boyfriends. Their mother was involved in drugs and alcohol when they were young, and then she pulled herself together for a few years, got married in the LDS Temple, and tried to live a normal life. However, once [CP] came forth with the allegations about [Defendant], her mother deteriorated again. She eventually went back to substance abuse.

[CP] said her life has been very difficult. After the disclosures of sexual abuse, [CP] said her brother was involved in treatment at Benchmark Behavioral Health in Woods Cross, Utah, for a few months. [Their mother,] Debbra Pulham was upset by this, and made [CP] tell Benchmark staff that the abuse never happened. [CP] finally relented. She told them, "I am being forced to tell you the abuse never happened." That day, she ran away from home.

R. at 52–53, 55.

Based on those allegations, the PSR recommended adding five levels to Defendant's total offense level, stating: "The defendant has engaged in a pattern of activity involving the sexual abuse of minors. He has at least three hands-on victims in Utah. Five levels are added. USSG. 2G2.2(b)(5)" R. at 52. The PSR does not state or even cite the statutory definition of sexual abuse referenced by that guideline. Although

3

the government now agrees that the allegations in the PSR do not satisfy that definition, *see* Aplee Br. at 12 ("[T]he government would concede that the conduct described in the PSR does not fit the definition of sexual abuse or exploitation as set forth in the guideline . . . ."), neither the parties nor the district court caught that error at sentencing.

Defendant's sole objection to the PSR was that the allegations of sexual abuse were unreliable, not that they were legally insufficient. In response to that objection, the probation office stated:

> It is true the allegations did not result in a formal prosecution or delinquency petition. However, the defendant's sisters and his childhood friend recall that [Defendant] was in residential treatment, perhaps as long as six months, as a result of the investigation by Utah Child Protective Services. In addition, the Probation Officer spoke with the defendant's sister, [CP], during the course of this presentence investigation. As noted in paragraph 42, she confirmed the abuse previously documented in the investigative reports of Utah Child Protective Services.
> Per Application Note 1 following U.S.S.G. § 2G2.2, the "pattern of activity" enhancement does not have a time limitation, and does not need to be based on conduct that resulted in a conviction.

R. at 69. Clearly, the legal sufficiency of the PSR's allegations was not on anyone's radar.

In an attempt to counter Defendant's unreliability argument, the government conducted telephone interviews with CP and JH. As the majority opinion points out, their statements, if believed, would establish the necessary predicate for the guidelines enhancement. But, as explained below, the credibility of the statements was highly questionable, and the record indicates that the district court did not believe the allegations that would be necessary to support the enhancement. In other words, to use the language of the third prong of plain-error review, "there is a reasonable probability that, but for the

4

error [in understanding the definition of *sexual abuse or exploitation* in the guideline], the result of the proceeding would have been different." *United States v. Rosales-Miranda,* 755 F.3d 1253, 1258 (10th Cir. 2014) (internal quotation marks omitted).

Special Agent Shannon Reinert, who conducted the two interviews, was the sole government witness at the sentencing hearing. Reinert interviewed CP three days after Defendant objected to the reliability of the allegations in the PSR. The only thing that CP said during the interview that supported the enhancement was that Defendant had "spread the lips of her vagina and place[d] his penis upon it." But there was good reason to question the accuracy of that statement. Agent Reinert testified that CP (who had been diagnosed with paranoid schizophrenia) had not reported this allegation (or much of the other conduct she now described) to the Department of Family Services in 1989 when she had falsely accused Defendant of raping her (as the PSR noted, a medical examination showed no penetration). One wonders why CP had not reported these allegations 27 years before, when her memory had been much fresher. It was not a matter of shyness. After all, she had falsely accused Defendant of rape at that time. Even the prosecutor was not too impressed with CP's reliability, stating, "If we were just talking about [CP], because of all the things that are swirling around here I could see where the Court could have some question about whether or not it's more likely than not that she was sexually abused by her brother." R. at 159.

As for JH, Agent Reinert conducted the telephone interview with her on the morning of the sentencing hearing. Reinert testified that JH was "currently going through a medical board process for neurological injuries sustained resultant from a deployment

to Iraq." R. at 145. After recounting JH's allegations a few hours earlier of multiple sexual assaults when she was 10, Reinert acknowledged on cross-examination that JH had reported when she was still a child only a single instance of abuse– the incident summarized in the PSR. At the time of that report JH had been in counseling; her therapist learned of the incident and recommended notifying the Department of Family Services (DFS). According to the PSR, JH "ran home" after the incident, "and her mother did not let her go to the Pulham residence any more." R. at 53. The DFS investigation apparently concluded that this was a one-time occurrence, and JH's mother believed that as well. The police did not file charges against Defendant. The contemporary evidence regarding the incident cannot be reconciled with the account JH gave to Agent Reinert. There is compelling reason to doubt that she had experienced the newly reported incidents when she had not bothered to tell anyone at the time they allegedly occurred.

Statements in an unsworn telephone interview are of questionable reliability. *See United States v. Fennell,* 65 F.3d 812, 814 (10th Cir. 1995) ("Unsworn out-of-court statements made by an unobserved witness and unsupported by other evidence form an insufficient predicate for a sentence enhancement under [USSG] 2K2.1(b)(5)."). In light of the serious weaknesses with the substance of the statements, it would be surprising if the district court gave them any substantial weight (to say nothing of whether the district court could properly give them any weight whatsoever).

And in fact the record strongly suggests that the district court, although referencing the telephone interviews as support for the allegations of sexual misconduct

6

in the PSR, did not rely at all on those portions of the interviews accusing Defendant of conduct that would fit the definition of *sexual abuse or exploitation*. When explaining why it was imposing the enhancement, the district court addressed the conduct toward JH as follows:

> The factors that seem persuasive to the Court in terms of the application of this enhancement are the -- to begin with, *the instance reported by* [JH]. Whether that was one or more instances, we have someone of a particular age that correlates with the age of [CP], and it also correlates with the age of images found on the defendant's computer associated with this particular offense. The types of conduct detailed by two separate individuals also is similar which seems to corroborate the stories.

R. at 163 (emphasis added). What is the "instance reported by" JH? That could only be a reference to the sole instance involving her that is described in the PSR. Yet, as admitted by the government, that was not an instance of "sexual abuse or exploitation of minors" within the guidelines definition. To the extent that the court was relying on that "instance" or on similar "instance*s*," the court was not distinguishing between conduct that satisfied the guidelines definition and conduct that did not. Not having been alerted by the parties or the probation office to the proper definition of *sexual abuse or exploitation,* the court was not focusing on the strict requirements of that definition.

The court then turned to the misconduct alleged by CP. It noted that at the time of the incidents Defendant's father did not seem to seriously contest that Defendant had acted sexually toward CP, and it apparently thought that such conduct would suffice under the guidelines:

> I didn't hear Mr. Pulham testify that [CP] victimized [Defendant] by her report. It was like, well, we -- the doctor couldn't tell us whether there was any touching, and so it sort of seems to kind of go out into the atmosphere

7

as though that was the end of it, when certainly sexual exploitation doesn't have to be sexual intercourse.  It doesn't have to be really much of what was described by the girls to amount to sexual exploitation.

R. at 164.

In my view, this passage from the transcript demonstrates that the court was not making the findings required by the guideline.  After stating that the guideline does not require sexual intercourse, the court says, "It doesn't have to be really much of what was described by the girls to amount to sexual exploitation."  That would be a very strange thing to say if the court understood that if it did not find sexual intercourse, it had to find that Defendant had oral sex with JH on multiple occasions, or that he had placed his penis on CH's vagina multiple times, or that both had occurred.  When the court said, in essence, that it could disregard "much" of what CP and JH described and still impose the guideline enhancement, surely the court was not saying that it could disregard the least egregious misconduct.  Rather, it was indicating that it could disregard the most egregious misconduct; but that is the only misconduct relevant to the guideline.  The only reasonable explanation for the court's statement is that it misunderstood what the guideline required.

The court then concluded:

So the statements by the grown women, [JH] and [CP], the age that they were at correlate and it correlates with the images to which [Defendant] is attracted because of the offense conduct associated with child pornography. And so I believe that the -- that it is more probable than not that the defendant engaged in a pattern of activity, which is at least two, involving the sexual abuse or exploitation of minors.

With that conclusion, I'll accept the Presentence Report's findings of fact and put the following guideline calculation on the record.

8

R. at 164. I think it quite significant that the only finding by the court was its acceptance of the PSR's findings. It never said what it believed had occurred between Defendant and JH or CP; it relied on their remarkably unreliable statements only to support the PSR because the statements, in some general way, correlated with the PSR. There is a big difference between saying that the interviews supported the PSR and saying that the most extreme allegations recited in the interviews are true. The district court did not say the latter.

Because the record clearly shows that the district court applied an incorrect interpretation of USSG § 2G2.2(b)(5) when it imposed the sentence enhancement on Defendant, I would reverse and remand for resentencing.